# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LYLE G. RARDON, *et al.*,<br><br>                  Plaintiffs,<br>v.<br>HOLLAND, LP, *et al.*,<br><br>                  Defendants. | Civil Action No. 16-00539 (TFH) |

## MEMORANDUM OPINION

This action is brought by Lyle G. Rardon and his wife, Carolyn, against Holland, LP ("Holland"), Justin L. McFerrin, William T. Davis, and Plasser American Corp. ("Plasser").[1] The suit arises out of an October 6, 2013 accident in a Metro tunnel between the Union Station and Judiciary Square platforms while Washington Metropolitan Area Transit Authority ("WMATA") employees and Holland contractors performed rail maintenance. Rardon was one such WMATA employee and was injured following an explosion in the tunnel. Extensive discovery has been conducted, and Plasser has now moved for summary judgment.

## UNDISPUTED FACTS

*The Project*

In the spring of 2013, WMATA began a project to repair and replace portions of the Washington D.C. Metro-rail system. To complete the project, WMATA used three major pieces of equipment: 1) a Prime Mover; 2) a Flash-Butt welding system; and 3) a Pettibone Speed

---

[1] The Court previously granted in part and denied in part Holland, LP, McFerrin, and Davis' motion for summary judgment from the bench. That ruling is reflected in a separate order. *See* ECF No. 52.

Swing.[2] WMATA contracted with and provided detailed specifications to Plasser, a machine-building company, to construct the Prime Mover on its behalf. Those specifications included, *inter alia*, a requirement for Plasser to incorporate a hydraulic system onto the machine. The purpose of the hydraulic system was to power various WMATA tools. The specifications detailed that Plasser was to include "a failsafe safety circuit to shut off hydraulic tank flow in the event of catastrophic failure, i.e. hose rupture." Plasser Material Facts Not in Dispute ¶ 8. The specifications also explicitly instructed Plasser to use "Twin Parker Parflex 518C-8 nonconductive SAE 1000R7 ½[inch]" hose for the hydraulic system. *Id*. ¶ 7. WMATA's specifications did not include instructions to place warning labels on the machine.

Plasser constructed the Prime Mover according to WMATA's specifications with only one change. During the building process, Plasser asked WMATA whether it wanted the hydraulic hose reels, specified to be constructed on the front of the Prime Mover, to be relocated to the back. Email Chain [ECF No. 45-1]. The inquiry stemmed from Plasser's understanding that the welding would occur from the back of the machine, and thus all ancillary functions, powered by the hydraulic system, would likely occur behind the machine as well. *Id*. WMATA agreed with the suggestion and Plasser moved the reels to the right-rear of the machine. *Id*.

---

[2] A Prime Mover is, in essence, a mobile rail-way maintenance hub with various heavy tools attached to it and space to transport passengers. Flash-Butt welding is a type of "resistance" welding that does not use any filler materials. The weld is performed by heating the rail ends to a very high temperature through the application of electricity and then forcing the ends together with a hydraulic pulling system. The welding was completed using a Flash-Butt welding "head" attached to the Prime Mover. The process of pressing the hot rails together creates a mounding of extra material, known as "slag" or "upset." This extra material is trimmed from the hot weld with a device known as a "sheer die." The sheer die slides along the rail, sheers off the upset and moves it away from the hot weld. The upset is then pried off of the rail and left to cool before being discarded. The Pettibone Speed Swing is a type of lifting machine deigned to lift and move heavy rail sections. It is a miniature mobile crane of sorts.

WMATA separately contracted with Holland to provide the Flash-Butt welding head to mount onto a boom attached to the left-rear of the Prime Mover. Contract [ECF No. 37-14]. Under the contract, Holland employees would perform the welding services, including removing the hot sheered upset from the rail. *Id*. WMATA employees would then take over, completing the process by "profile" grinding or "finish" grinding the weld so that the rail would be seamless and smooth. *Id*. The industrial grinder was to be hydraulically powered using the line attached to the right-rear of the Prime Mover.

*The Night of the Accident*

On October 6, 2013, Holland's work crew included defendant Justin McFerrin (supervisor), and defendant William Davis (senior welder). WMATA's work crew included, among others, the plaintiff, Lyle Rardon and profile grinder Jamaal Haggie. The night's task was to remove and replace sections of rail in the underground segment of the Red Line between the Union Station and Judiciary Square stops.

McFerrin began operation of the welding head. After the completion of each weld, Davis removed the hot sheered upset material from the rail and placed it across the third rail, between the third rail and the tunnel wall, to cool. Davis Dep. 22:1-23:8 (Aug. 12, 2016) [ECF No. 37-18]. Haggie would then wait a few minutes until the weld cooled sufficiently for him to grind using the hydraulically powered grinder.

The grinder was attached to the Prime Mover via the hydraulic line located on the rear of the machine. Haggie ran the line from the right-rear of the Prime Mover down the tunnel in between the third rail and the tunnel wall so that the line could not contact the hot weld. The Holland crew waited while Haggie completed his job five separate times. Davis Dep. 20:25-21:6; Rardon Aff. ¶¶ 37, 43 [ECF No. 43-7].

After six successive welds and five grinds, hot sheer upset punctured Haggie's hydraulic line. The puncture in the line caused the hydraulic fluid to aerosolize. The mist then caught fire, creating a fireball and panic in the tunnel. As tunnel workers reacted to the blaze, a rail that was suspended by the Pettibone Speed Swing crane some distance down the tunnel fell, injuring three people including Rardon.

## DISCUSSION

Rardon asserts claims against Plasser for negligence, and strict liability for design defect and failure to warn. Underlying all of his claims is the assertion that the Prime Mover is defective in that it should have been designed and manufactured in a way that it would have: 1) protected the hydraulic hose from heat and abrasion; 2) failed to a safe condition if the hydraulic hose was punctured; and 3) included proper warnings related to the consequences of working with hydraulic hoses around the welding process.

### I. Legal Standard

Federal Rule of Civil Procedure 56 mandates that "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. At the summary judgment stage, however, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*.

Although "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party," *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted," *Anderson*, 477 U.S. at 249 (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 252. The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*.

The evidence the Court may consider when passing on a summary judgment motion consists of "materials specified in Federal Rule of Civil Procedure 56(c) as well as any material that would be admissible or usable at trial." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 145 (D.C. Cir. 2011) (internal quotation marks omitted). Pursuant to Rule 56(c), the Court is not limited to the evidence cited by the parties but also "may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In addition, the Rules of the United States District Court for the District of Columbia state that "[i]n determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1), *available at* http://www.dcd.uscourts.gov/court-info/local-rules-and-orders/local-rules.

## II.    Contractor Specification Defense

The question presented to the Court is whether Plasser had a duty to go beyond the specifications of the WMATA contract to ensure that the Prime Mover was safe. Based on the

evidence in the record, the material facts are uncontested. In an earlier lawsuit arising out the same incident, WMATA, in its capacity as a third party plaintiff, was required to take a position on whether the hoses on the Prime Mover complied with the requirements of the contract. *See generally, Estate of Felder v. WMATA v. Plasser American Corp.,* 14-cv-01905-TFH (2014). First, Clay Bunting, WMATA's corporate designee who was familiar with the entire contract, testified that Plasser had no role in writing the specification for the hydraulic system. Bunting Dep. 22:2-22:4 (March 10, 2016) [ECF No. 38-4]. Bunting then testified that the use of the Parflex hose was appropriate "if all other factors are taken into consideration and cared for," and that he did not know of other factors that Plasser should have taken into account. *Id.* at 76:8-77:4 [ECF No. 38-5]. Finally, Bunting testified that that hydraulic system on the Prime Mover did contain a fail-safe circuit to shut off the hydraulic tank flow in the event of a hose rupture. *Id.* at 78:15-79:6 [ECF No. 38-6]; Franco Lezzi Dep. 36:25-38:17 (March 24, 2016) [ECF No. 42-12] (same).

Rardon has retained as an expert witness Greg Paulsen, a professional engineer by training. Paulsen testified that in his opinion Plasser should have covered the Parflex hose in a protective sleeve. Paulsen Dep. 144:15-145:11 (May 31, 2017). He also claimed that the hydraulic system did not have a failsafe as he understands the definition of a failsafe. *Id.* at 124:8-125:10. His later testimony, however, revealed that he did not complete an investigation of every hydraulic system on the Prime Mover, and that his opinion related to automatic shut off valves for the hydraulic hoses, not the entire hydraulic system. *Id.* at 132:1-133:9. This distinction is critical in that Paulsen also acknowledged that other than a single page related to the hydraulic failsafe mechanism, he did not read the contract or specifications and could not opine as to whether the Prime Mover met the specifications, or even who wrote them. *Id.* at

122:5-123:9, 124:4-125:1, 126:2-126:16. In this Circuit, a party cannot create a fact issue to avoid summary judgment by offering an expert opinion that is not supported by a proper foundation. Fed. R. Evid. 702(b); *Martin v. Omni Hotels Mgmt. Corp.*, Civil Action No. 14-2182 (RC), 2017 WL 2465043, at *4 (D.D.C. 2017) (quoting *New York State Ophthalmological Soc'y v. Bowen*, 854 F.2d 1379, 1391 (D.C. Cir. 1988) ("[A] party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations.")).

District of Columbia law recognizes liability for negligent design if the manufacturer of a chattel fails to use reasonable care in adopting a safe plan or design. *Turner v. American Motors General Corp.*, 392 A.2d 1005, 1007 (D.C. 1978). In strict liability, the District imposes liability for defective product design when the seller: 1) was engaged in the business of selling the product; 2) the product was defective when it left the seller; 3) the product was not substantially changed before it reached the plaintiff; and 4) the product defect caused the plaintiff's damages. D.C. Std. Civ. Jury Instr. No 23-09. These standards do not obviously incorporate a "contractor specification defense," nor has the District of Columbia had the opportunity to explicitly address the applicability of such a defense in this context. The Court, however, will adopt the Contractor Specification Defense as applicable to the factual scenario presented here – a contractor following the detailed specifications provided by a sophisticated customer, with oversight, to build a product not for use by the general public.

The Contractor Specification Defense derives from the Restatement (Second) of Torts, Section 404, which states: "One who as an independent contractor negligently makes, rebuilds, or repairs a chattel for another is subject to the same liability as that imposed upon negligent manufacturers of chattels." Comment a., however, then recognizes that:

> [O]ne who employs a contractor to make a chattel for him, like one who employs a contractor to erect a structure on his premises [] usually provides not only plans but also specificatons [sic], which often state the material which must be used… In such a case, the contractor is not required to sit in judgment on the plans and specifications or the materials provided by his employer. The contractor is not subject to liability if the specified design or material turns out to be insufficient to make the chattel safe for use, unless it is so obviously bad that a competent contractor would realize that there was a grave chance that his product would be dangerously unsafe.

Restatement (Second) of Torts § 404, Cmnt. a. (1965).

Federal courts in both Maryland and Virginia have looked to this principal for guidance. In *Housand v. Bra-Con Indus., Inc.*, 751 F. Supp. 541 (D. Md. 1990), the United States District Court for the District of Maryland barred the plaintiff's negligence and strict product liability claims under the defense. There, an automobile plant worker who was injured when he was struck by an automatic mechanical arm brought action against the engineering company that designed the arm and others involved in the installation. The evidence showed that the defendants followed the specifications in their contracts, and that even though the court referred to them as "designers," the customer, General Motors, maintained significant control over the manufacture and installation of the equipment. *Id.* at 543. On defendants' motion for summary judgment, the district court first recognized that the Restatement principles were a source of Maryland law, and then granted the defendant's motion based on, *inter alia,* the "contractor's defense" which it noted was "embedded in and reflect[ed] [in] the realities of the industrial world." *Id.* at 545.

In granting the defendant's motion for summary judgment, the *Housand* court cited to *Spangler v. Kranco, Inc.*, 481 F.2d 373 (4th Cir. 1973). In *Spangler*, the Fourth Circuit, applying Virginia law, affirmed the grant of a directed verdict for a defendant manufacturer. There, the plaintiff was struck by an overhead crane while he was working as a pipefitter on a job site. The

allegations included that the crane, manufactured by Kranco Inc., was defective because it did not contain any warning devices that were activated when the crane was in motion. The court, in affirming the district court's dismissal of the case, relied in part on the principle that a manufacturer is not liable for an allegedly defective product "where the product has been manufactured in accordance with plans and specifications of the purchaser except where the plans are so obviously dangerous that they should not reasonably be followed. *Kranco*, at 375(citing *Littlehale v. E.I. du Pont, etc. & Co.*, 268 F. Supp. 791, 802 n.16, (S.D.N.Y. 1966), aff'd 380 F.2d 274 (2d Cir. 1967); *Davis v. Henderlong Lumber Co.*, 221 F. Supp. 129 (N.D. Ind. 1963); *cf. Greater Richmond, etc., Inc. v. A. H. Ewing's Sons, Inc.*, 200 Va. 593 (Va. 1959)).

More recently, the Maryland Court of Appeals has also offered, without holding, that because of its roots in the Restatement (Second) of Torts, Maryland would likely recognize the contractor's defense. *Miller Metal Fabrication, Inc. v. Wall*, 415 Md. 210, 217 n.5 (2010).[3]

Of course, the District of Columbia often looks to the Restatement (Second) of Torts for the source of its laws. *See, e.g., Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*, 383 F. Supp. 2d 32, 44 (D.D.C. 2005). Additionally, "on an undecided issue of common law this court is to look to the law of Maryland." *Daily v. Exxon Corp.*, 930 F. Supp. 1, 2 (D.D.C. 1996) (citing *Gerace v. Liberty Mut. Ins. Co.,* 264 F. Supp. 95, 97 (D.D.C. 1966)).

While Rardon argues that *Turner v. Am. Motors Gen. Corp.* suggests that the District has rejected the contractor specification defense, the Court does not agree. 392 A.2d 1005 (D.C. 1978). In *Turner*, the District of Columbia Court of Appeals held that the manufacturer of a bus

---

[3] "The contractor's defense shields a manufacturer from liability for injuries caused by a product fabricated according to specifications or plans provided by the purchaser. *Housand v. Bra-Con Indus., Inc.,* 751 F. Supp. 541, 544 (D. Md. 1990). This doctrine has not been adopted in Maryland by a reported opinion of a State appellate court. *But see id.* at 544-45 (noting the doctrine's likely applicability in Maryland because of its roots in the Restatement (Second) of Torts, a common source of Maryland tort law)." *Id.*

was not insulated from a negligent design claim simply because it complied with federal safety regulations and with WMATA's contract specifications in designing the bus. *Id*. at 1007. The specifications required that the "bell cords," used to signal a stop for the driver, "shall not be visible from the outside of the bus," but did not otherwise provide detail such as a specific location for the cords or hand-holds for passengers to assist accessing them. Indeed, the court noted that the contract at issue only set out one specification intended as a safety feature and therefore the manufacturer's compliance was not dispositive of the question of its breach of the appropriate standard of care. The *Turner* court did not address WMATA's supervision of the bus design/manufacturing process, nor did it address the Restatement (Second) of Torts, Section 404.

Here, the extremely detailed contract specifications were written by WMATA for Plasser to build a machine for use, not by the public, but by WMATA's and Holland's trained employees. The specifications were so detailed that they included not only the location of the hydraulic hose reels, but the exact brand, type, and size hose to be used. Significantly, the evidence shows that WMATA maintained control over the design of the Prime Mover such that Plasser required permission to make any changes.

Under the *Restatement*, a designer or contractor may still be held liable, even if it followed the customer's specifications, if the defect is obvious. While Paulsen did testify that the Prime Mover was defective, his opinion sounds in the reasonable person standard of care for negligence and was developed without the benefit of reviewing the entire contract. The exception to the contractor specification defense for an obviously dangerous defect cannot be triggered by simple negligence, lest the exception be allowed to swallow the rule. There is simply no evidence in the record that the Prime Mover had an obvious defect.

A growing majority of courts have held that in both negligence and strict liability, a manufacturer who "merely fabricates a product according to the purchaser's design is not responsible, in the absence of an obvious defect, if the design proves bad." *Hatch v. Trail King Indus., Inc.*, 656 F.3d 59, 69 (1st Cir. 2011) (citing cases). The Court agrees.

## **CONCLUSION**

For all the foregoing reasons, the Court will grant Plasser's Motion for Summary Judgment [ECF No. 38] related to Counts VI, VII, and VII. An appropriate order will accompany this opinion.

September 26, 2017

                                                       /s/ Thomas F. Hogan
                                                           Thomas F. Hogan
                                                           SENIOR UNITED STATES DISTRICT JUDGE